UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM R. McDONALD,<br>    on behalf of his minor daughter,<br>    ALYSSA McDONALD,<br>                  Plaintiff, | CIVIL ACTION NO.<br>3:02cv1040 (MRK) |
| v. | |
| CHARLES F. SWEETMAN, et al.,<br>                  Defendants | |

**RULING**

Plaintiff Alyssa McDonald brings this suit against various school district Defendants, alleging that they violated her Fourteenth Amendment rights to substantive and procedural due process by suspending her from school for ten days based upon unfounded allegations of distributing marijuana-laced brownies. She also asserts a state law claim for intentional infliction of emotional distress. Defendants have moved for summary judgment on the grounds that Plaintiff received all the process that was due and because the school officials' conduct did not rise to the level of conscience-shocking behavior prohibited by the Constitution or state common law. [doc. #21]. Though the conduct alleged here is dismaying, to say the least, the United States Supreme Court has set an extremely high bar for constitutional claims of this nature, a bar Plaintiff cannot clear. The Motion for Summary Judgment is thus GRANTED.

**I.**

Defendant has not challenged any of Plaintiff's contentions and thus effectively accepts them as true for the purposes of summary judgment, arguing that even if everything Plaintiff

claims is true, the conduct is not actionable. Plaintiff has submitted sufficient evidence, including the depositions of herself and her father, to allow the Court to accept her allegations as true at this stage.

On May 2, 2001, Alyssa McDonald, ("Alyssa"), then fifteen years old and a ninth grader at Shepaug High School, took with her on the school bus some brownies she had made at home the night before. Compl. [doc. #1] ¶¶3, 7, 8. She distributed these brownies, as she often did, to a number of students on the bus, including Michael Nield, Caitlin Nield, and Peter Foster. Defs' Local Rule 9(c)1 Statement [doc. #23] ¶6.[1]  While she was doing so, Michael Nield apparently told students on the bus that the brownies contained marijuana. Alyssa McDonald Dep. [doc. #22], Ex. 5, at 11-12. Alyssa herself never told anyone that the brownies contained marijuana nor did the brownies in fact contain any marijuana. *Id.* at 12, 14.

On May 4, 2001, David Telesca ("Telesca"), the Principal of Shepaug Middle School, received a telephone call from Patricia Clarke, mother of James Clarke, a seventh grader at the school.  Ms. Clarke stated that her son had come home from school "acting in a very unusual manner," behaving "very silly and sleepy." Aff. of Patricia Clarke, *Id.* Ex. 4. Her son told her that he had eaten a brownie with pot in it, that he had been given the brownie by Michael Nield, and that it had been made by Alyssa McDonald. *Id.*  Telesca began to look into the incident, during which he reported the information he had received from Ms. Clarke to Eugene Horrigan ("Horrigan"), Principal of Shepaug High School. Def.'s 9(c)1 Statement, ¶10.

On May 7, 2001, Horrigan summoned Alyssa to his office midway through the first

---

[1] Alyssa apparently regularly baked for the school for special events. William McDonald Dep. at 29.

period of the school day. Alyssa McDonald Dep. at 18. Alyssa had no idea why she was being called into the office. *Id.* at 19. When she entered his office, Horrigan closed and locked the door, leaving the two of them alone, and proceeded to inform Alyssa of the allegations and tell her she was "looking at being expelled." *Id.* Alyssa denied the charges. *Id.* at 22. Horrigan told her he had received the information from both a student and from a student's mother. *Id.* at 23. This meeting lasted half an hour, at which point Alyssa became very upset. The school nurse was called and Alyssa was put in the nurse's office with the door closed and locked. *Id.* at 24-25, 53. Alyssa was not allowed to have any food or water. She was prohibited from using the bathroom herself, and had to have the nurse stand by the door and watch her. *Id.* at 54. She was also not allowed to call her father. *Id.*

An hour or so later, Alyssa had another meeting with Horrigan and the nurse in Horrigan's office. At that time, Horrigan told Alyssa that if she would tell him about other students in the school who were using drugs, he would reduce her punishment and limit it to a short in-school suspension. *Id.* at 26. Alyssa insisted that she did not know anyone who used drugs. *Id.* Alyssa then went back to the nurse's office where she waited an hour or so, until she was told that her father, William McDonald, had been notified of the incident and asked to come to the school. *Id.* at 57. At that point, Alyssa spoke to her father on the telephone for a few minutes and insisted she had not done anything wrong. William McDonald Dep. [doc. #22], Ex. 6, at 11.

After Mr. McDonald arrived at the school, Horrigan met with him alone for around fifteen or twenty minutes. *Id.* at 13, 20. Horrigan told Mr. McDonald that a parent had called and said that her son had obtained brownies from Michael Nield and "that Mike Nield had told him that those brownies were baked with pot and that Alyssa McDonald had baked those brownies

and given them to him on the bus." *Id.* at 14. Horrigan also informed Mr. McDonald that a number of students were being suspended because of the incident, including Peter Foster and Michael Nield. *Id.* at 13. Mr. McDonald told Horrigan he expected that a hearing would take place at which all the facts could be discussed and at which Alyssa could be represented by counsel, to which Horrigan allegedly replied, "The hearing is over, the decision has been made. All that's left is to have a determination of the punishment, whether I decide to recommend that your daughter be expelled or simply suspended for ten days." *Id.* at 20. Mr. McDonald then argued that more information was necessary before Horrigan could make such a decision. In particular, Mr. McDonald urged Horrigan to speak with Alyssa's sister – who had been with Alyssa when she baked the brownies and could say whether Alyssa had put marijuana in the brownies – and to give Alyssa a drug test to see whether she had used any marijuana. *Id.* at 21. According to Mr. McDonald, Horrigan replied that it would make no difference what the results of any drug test were, because he knew Alyssa had done it and that any other input would be irrelevant. *Id.* Mr. McDonald then stated, "You're acting like you think you're God," to which Horrigan allegedly responded, "I am God in this situation. I get to make the decisions and I have no accountability to anybody except myself and the superintendent." *Id.* at 22.

    At this point, Mr. McDonald insisted that Alyssa be present for the discussion. Soon after she joined the meeting, Horrigan told Alyssa that she would be suspended. Alyssa McDonald Dep. at 30. Both Telesca and Rebecca McDonald, Alyssa's sister, who was in seventh grade at Shepaug Middle School, participated in this meeting as well. William McDonald Dep. at 31. Rebecca McDonald told Horrigan and Telesca that she had seen Alyssa make the brownies in question and that Alyssa had not put any marijuana in them. Telesca apparently then insinuated

that Rebecca was lying. *Id.* Mr. McDonald repeated his offer to have Alyssa take a drug test and demonstrate that she had not used marijuana, but Horrigan once again refused, allegedly stating, "I won't pay any attention to it. This child has such a deep knowledge of marijuana that I am sure she knows all the tricks to mask this drug in her urine. Therefore, any tests you've got I wouldn't pay any attention to whatsoever." *Id.* at 36. After Mr. McDonald asked what he could do to address the issue, Horrigan said, "You can't do anything. The hearing has been closed. My decision will be made, the superintendent will be informed and you and your daughter will be informed." *Id.* at 35. At that point, the McDonalds left and went home.[2]

Approximately a week later, after Alyssa had visited the drug counselor and taken a drug test, which found no drugs in Alyssa's system, Mr. McDonald called Horrigan. Horrigan said that Mr. McDonald should be pleased because he (Horrigan) and Charles Sweetman, the Superintendent of the School District, had decided to only suspend Alyssa for ten days. *Id.* at 37. Mr. McDonald later met with Sweetman in an effort to remedy the situation, but Sweetman refused to revoke Alyssa's suspension, to issue an apology, to make any changes in school's disciplinary policy, or to allow Mr. McDonald to have a hearing in front of the school board. *Id.* at 43-44, 53-54. Sweetman also stated that he did not believe the results of any drug tests. *Id.* at 54.

Plaintiff filed this suit on June 17, 2002, asserting a denial of the substantive due process and procedural due process guaranteed by the Fourteenth Amendment, a violation of the Family

---

[2]Alyssa also testified that Telesca and William Domonell, Vice-Principal of Shepaug Middle School, went around to all the middle school classes and told them that rumors about a high school student distributing marijuana brownies on the school bus were true. Though they did not name Alyssa directly, according to Alyssa, all the students knew that the rumors concerned her specifically. Alyssa McDonald Dep. at 33-34.

Education Rights and Privacy Act, 20 U.S.C. §1232g,[3] and a state law claim for intentional infliction of emotional distress under Connecticut law. Compl. [doc. #1], ¶¶17, 18, 19. Defendant has moved for summary judgment [doc. #21].

## II.

Summary judgment is appropriate when there is no dispute as to a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of demonstrating that there is no genuine material dispute of fact. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000). The Second Circuit has held that "in determining whether a genuine issue has been raised, the inferences to be drawn from the underlying facts revealed in the affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Tomka v. Seiler*, 66 F.3d 1295, 1304 (2d Cir. 1995). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Because the parties present no genuine issue of material fact and Defendant has challenged none of Plaintiff's assertions, this case is suitable for summary judgment; the only question for the Court to decide is whether the alleged conduct constitutes a constitutional violation.

### A.

---

[3]Plaintiff did not address Defendants' assertion that there is no private cause of action available under FERPA in its brief, and the parties represented in a telephone conference with the Court on October 23, 2003 that the FERPA claim is no longer in the case, the plaintiff having abandoned that claim.

The Supreme Court has affirmed on numerous occasions that students do not shed their constitutional rights at the schoolhouse door. *See, e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."). Defendants do not claim otherwise. At the same time, "the nature of those [constitutional] rights is what is appropriate for children in school." *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 656 (1995). Schools thus have considerable latitude in their supervision and control of students. *New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985). And in recent years, nowhere has that latitude been greater than in the context of student drug use. *See, e.g., Vernonia*, 515 U.S. at 661. No one can doubt the legitimacy or importance of our educational institutions' efforts to deter and control drug use by our Nation's schoolchildren. In this case, the question is whether one school's efforts to guard against student drug use were so misguided that they violated Plaintiff's constitutional rights to procedural or substantive due process under the Fourteenth Amendment.

**Procedural Due Process**.   The Supreme Court has addressed at length the question of what process is due in case of school suspensions in order to prevent unfair or mistaken findings of misconduct and arbitrary exclusion from school. "Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss v. Lopez*, 419 U.S. 565, 581-82

(1975); *see also Rosenfeld v. Ketter*, 820 F.2d 38 (2d Cir. 1987) (following *Goss*). However, "[t]here need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Goss*, 419 U.S. at 582. The Supreme Court has thus emphasized that the Due Process Clause requires only that, "in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is." *Id.*

Because Alyssa was suspended for only ten days, she was entitled under the Due Process Clause to: 1) oral or written notice of the charges against her; 2) an opportunity to deny them and tell her side of the story; and 3) an explanation of the evidence against her. Plaintiff does not claim that Alyssa was denied any of these protections prior to her suspension. Rather, Plaintiff's argument is essentially that because Defendants acted without knowing the truth about what had occurred and indeed, in the teeth of evidence that exonerated Alyssa of the claims made against her, Alyssa's right to procedural due process was violated. Opp'n to Mot. for Summ. J. [doc. #24] at 4-5. Plaintiff has provided no judicial authority to support this contention and the Court knows of none. In fact, the Supreme Court seems to have suggested the converse: "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. . . . The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees." *Wood v. Strickland*, 420 U.S. 308, 326 (1975). Moreover, the Second

Circuit's decision in *Rosenfeld* suggests that a student's opportunity to present his or her side of the story is sufficient process even if the decisionmaker explicitly states, as occurred here, that the story will not be credited. *Rosenfeld*, 820 F.2d at 39-40. While Alyssa may rightly feel that she was tried, convicted, and sentenced by school officials who had already made up their minds, the fact remains that before she was suspended, Alyssa was given oral notice of the charges against her, an opportunity to present her version of the facts, and an explanation, however feeble, of the evidence against her. That is all the process that is required under the Constitution.

**Substantive Due Process**. Alyssa's principal claim is not that she was denied notice of and an opportunity to defend against the charges of distributing marijuana-laced brownies, but rather that school officials abused their authority by treating Alyssa harshly and unfairly during the interrogation and acting arbitrarily in suspending Alyssa when all the evidence showed that the charges against her were untrue. This, Alyssa claims, violated her Fourteenth Amendment right to substantive due process.

Not all wrongs perpetrated by a government official violate substantive due process rights. Substantive due process does not protect "against government action that is 'incorrect or ill-advised,'" *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (quoting *Bishop v. Wood*, 426 U.S. 341, 350 (1976)). The Second Circuit has stated that "the protections of substantive due process are available only against egregious conduct which goes beyond merely 'offending some fastidious squeamishness or private sentimentalism' and can fairly be viewed as so 'brutal and 'offensive to human dignity' as to shock the conscience." *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 & n.6 (2d Cir. 1973) (Friendly, J.)); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).

9

The standard for such claims is therefore quite high. As Judge Henry Friendly noted in *Johnson*, "[the acts] must be such as 'to offend even hardened sensibilities.'" *Johnson*, 481 F.2d at 1033 & n.6 (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952).

      The standard for substantive due process violations has been set at an extremely high level to prevent courts from reading the language of the due process clause overbroadly and thereby constitutionalizing large areas of law. "As a general matter, the [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. The doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever we are asked to break new ground in this field." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). In particular, the Supreme Court has sought to ensure that the Constitution is not dragged into everyday tort disputes. Thus the Court has stated: "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels v. Williams*, 474 U.S. 327, 332 (1986); *see also Paul v. Davis*, 424 U.S. 693, 701 (1976) (refusing to find the "Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States"). Accordingly, the cases in which courts have recognized a viable substantive due process claim are limited to those presenting extraordinary circumstances. Indeed, the First Circuit has noted that where "plaintiff has not been physically abused, detained, prosecuted due to racial or political motivation or otherwise deprived of equal protection of the law, courts are reluctant to find 'conscience-shocking' conduct that would implicate a constitutional violation." *Torres v. Superintendent of*

*Police of Puerto Rico*, 893 F.2d 404, 410 (1st Cir. 1990).

Considering this high standard, and viewing this case in comparison with others that have refused to find a violation of substantive due process because the actions complained of were not offensive or egregious enough, this Court cannot conclude that the school officials' actions in this case rise to the level of a violation of Plaintiff's substantive due process rights. In *Smith*, for example, the plaintiff alleged that a teacher had slapped him across the face for no reason; nonetheless, the Second Circuit held that such behavior by a teacher did not constitute the kind of conscience-shocking conduct proscribed by substantive due process. *Smith*, 298 F.3d at 173. In *Lewis*, the Supreme Court held that an allegation that a police officer's high speed chase of a motorcycle was undertaken with deliberate indifference to the safety of the motorcycle's passenger, who in fact was killed, did not state a claim for substantive due process. *Lewis*, 523 U.S. at 855. In *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189 (1989), the Supreme Court found no violation of substantive due process in a case where a county department of social services knew that the plaintiff, a minor, was being abused by his father but took no steps to remove him from the father's home, resulting in the plaintiff being beaten so severely that he suffered permanent brain damage and was rendered profoundly retarded. Finally, in *Collins*, the Supreme Court declined to find a violation of substantive due process despite allegations that plaintiff died as a result of a municipality's "custom and policy of not training its employees about the dangers of working in sewer lines and manholes, not providing safety equipment at jobsites, and not providing safety warnings," even though the city had "notice of the risks of entering the sewer lines [and] had systematically and intentionally failed to provide the equipment and training required by a Texas statute." *Collins*, 503 U.S. at 117-18.

These cases make it abundantly clear that to raise successfully a substantive due process claim, the defendant's conduct must be unusually extreme and shocking. In this case, Alyssa was undoubtedly treated poorly by school officials. However, it is equally clear that the conduct and treatment that Alyssa was subjected to does not come close to the level of extreme malfeasance presented in the foregoing cases, none of which was held to violate substantive due process. Alyssa was not physically injured, nor was she ever placed in physical danger. Instead, she was given an unfortunate lesson in adult decisionmaking at its worst: arbitrary, insensitive, intolerant of reasoned response, and unwilling to concede error. From school officials who are supposed to be models of good behavior for students, this conduct is particularly disappointing and should be a matter of concern to the local school board. However dismaying that conduct may be, it nevertheless does not constitute a substantive due process violation. *See Smith*, 298 F.3d at 173 ("The wrong perpetrated in this case, though regrettable, simply is not of constitutional proportions.").

**B.**

Having disposed of the only federal claims in this case, the Court has discretion to dismiss the state claims as well under 28 U.S.C. §1367(c)(3). "In exercising its discretion with respect to retaining supplemental jurisdiction, the district court balances several factors 'including considerations of judicial economy, convenience, and fairness to litigants.'" *Correspondent Services Corp. v. First Equities Corp. of Florida*, 338 F.3d 119, 126 (2d Cir.2003) (quoting *Purgess v. Sharrock, M.D.*, 33 F.3d 134, 138 (2d Cir.1994). While considerations of judicial economy and convenience do not lean strongly in either direction, the nature of the case and Defendants' status as state actors suggests that it would be more appropriate and fair for a state

court to determine whether the behavior of school officials in this case was sufficiently egregious to violate state law. Accordingly, the Court will decline the exercise of supplemental jurisdiction over Plaintiff's state law claims. The state claims are dismissed without prejudice.

The Court thus GRANTS Defendant's Motion for Summary Judgment [doc. #21] in its entirety. The case is dismissed.

IT IS SO ORDERED

/s/        Mark R. Kravitz
U.S.D.J.

**Dated in New Haven, Connecticut: March 24, 2004**